**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ENVIRONMENTAL JUSTICE HEALTH ALLIANCE FOR CHEMICAL POLICY REFORM; CLEAN WATER ACTION; NATURAL RESOURCES DEFENSE COUNCIL, INC., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1-25:cv-7166 |
| v. | ) ) | |
| U.S. ENVIRONMENTAL PROTECTION AGENCY; LEE ZELDIN, in his official capacity as Administrator, | ) ) ) ) | |
| Defendants. | ) ) | |

**COMPLAINT**

1.     Across the United States, more than a hundred thousand facilities make, store, or use chemicals that, if spilled, can cause serious harm to human health and the environment. These facilities report many hundreds of hazardous substance spills each year, many of which reach waterways. Congress demanded regulations to address these kinds of spills when it passed the modern Clean Water Act in 1972. Yet, more than 50 years later, there is still no federal regulation in place to prevent these chemical spills and to protect nearby communities.

2.     The U.S. Environmental Protection Agency (EPA) agreed in a 2016 consent decree to finally take action on these required regulations. The Agency published its "Final Action" in 2019. Clean Water Act Hazardous Substances Spill Prevention, 84 Fed. Reg. 46,100 (Sept. 3, 2019). But that action did not include any new regulations. Instead, EPA continued the approach that it had taken for nearly half a century: it did nothing. EPA decided to issue no new regulations because it concluded that hazardous substance spills are not frequent or harmful enough to warrant action.

1

3.      That conclusion is arbitrary and unlawful. Faced with a statutory obligation to regulate, EPA was not free to say no. And even if it were, its reasons were irrational. EPA based its refusal to act on information about the scope and impacts of hazardous substance discharges that, by the Agency's own admission, was incomplete and underinclusive. And EPA concluded that a patchwork of other regulatory programs was sufficient to address the risk of hazardous substance spills, even though those regulations do not cover all hazardous substances, do not cover all facilities that may make, use, or store hazardous substances, and do not include all measures necessary to prevent and contain hazardous substance discharges. EPA's refusal to act leaves communities in the dark and unprotected.

4.      Plaintiffs ask the Court to hold EPA to the obligation Congress mandated over fifty years ago: to issue regulations to prevent and contain hazardous substance spills from non-transportation-related onshore facilities. EPA's decision refusing to issue those required regulations was arbitrary, capricious, and contrary to law, and must be set aside.

## PARTIES

**The Plaintiffs**

5.      Plaintiff Environmental Justice Health Alliance for Chemical Policy Reform (EJHA) is a national network of grassroots environmental and economic justice organizations and advocates in communities that are disproportionately impacted by toxic chemicals from legacy contamination, ongoing exposure to polluting facilities, and health-harming chemicals in household products. EJHA has over a dozen member community-based environmental justice organizations, located in ten states. EJHA's mission is to support its affiliate member organizations to achieve a just transition to a pollution-free economy that leaves no community or worker behind.

6.      Plaintiff EJHA brings this action on behalf of its member organizations. EJHA's member organizations represent communities in areas with dense concentrations of aboveground storage tanks and chemical facilities that make, use, or store hazardous substances. These organizations' members are fearful that hazardous substance spills from those facilities will harm their families' health by polluting the air and contaminating surrounding ground, surface, and drinking waters that they use and enjoy. EPA's refusal to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) increases the risk of harm from these facilities.

7.      Delaware Concerned Residents for Environmental Justice (DCR4EJ) is a member organization of EJHA. DCR4EJ's mission is to inform and empower Delaware communities to take action to protect fundamental rights to clean air, water, land, and food. DCR4EJ's members live and work in the heavily industrial Route 9 corridor, where numerous chemical plants are located near residences, including several historically Black neighborhoods. DCR4EJ's members are fearful that hazardous substance spills from those facilities will contaminate surrounding ground, surface, and drinking waters that they use and enjoy. EPA's refusal to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) increases the risk of harm from these facilities. DCR4EJ's members therefore have been and continue to be injured by EPA's refusal to issue the required regulations.

8.      Roby Anstett is a member of DCR4EJ and a founding member of Claymont Coalition for Environmental Justice (CC4EJ), a member organization of DCR4EJ. CC4EJ is a grassroots environmental, climate, and economic justice coalition of Claymont community members and justice-based allies aligned to support an inclusive, resilient riverfront community while taking action to improve their social determinants of health. Since 2020, Mr. Anstett has

lived in and around Claymont, Delaware, a neighborhood northeast of Wilmington, situated

along the Delaware River. Claymont is home to numerous refineries and other chemical facilities

that use and store hazardous substances and is downstream of chemical manufacturing facilities

along the Delaware River in Pennsylvania and New Jersey. Claymont suffers from both historic

contamination and ongoing industrial pollution. Mr. Anstett is constantly aware and concerned

that hazardous substance spills from the many chemical facilities in his community will

contaminate surrounding ground, surface, and drinking waters that he and his family use and

enjoy. Mr. Anstett uses water filters for his household's drinking and bathing water to avoid

potential exposure to contamination from unregulated hazardous substance spills that may not

have been reported to the public. He enjoys recreating in the parks and natural areas in

Claymont, but takes precautions to avoid contact with the water for fear of exposure to hazardous

substance contamination. EPA's refusal to issue hazardous substance spill regulations increases

Mr. Anstett's risk of exposure to hazardous substances. Mr. Anstett has therefore been and

continues to be injured by EPA's refusal to issue the required regulations.

9.      Dora Williams is a member of DCR4EJ. She is a long-time resident of Rose Hill

Gardens in Newcastle County, Delaware, a suburb of Wilmington situated between the Delaware

and Christina Rivers. Ms. Williams' community has a large concentration of chemical facilities

sited near residences. In 2018, a chemical manufacturing plant located just one mile from Ms.

Williams' home released 2,688 pounds of ethylene oxide, a highly flammable and toxic chemical

linked to increased cancer risks. The plant operator did not inform the community about the

incident until two days later. After the incident, Ms. Dora constantly worries about the potential

for another chemical spill and is concerned that there are inadequate safeguards to prevent future

incidents. EPA's refusal to issue hazardous substance spill regulations increases Ms. Williams'

risk of exposure to hazardous substances and harms her health and welfare. Ms. Williams has

therefore been and continues to be injured by EPA's refusal to issue the required regulations.

10.    Texas Environmental Justice Advocacy Services (t.e.j.a.s.) is a member

organization of EJHA. T.e.j.a.s. advocates on behalf of predominantly low-income residents that

live in and around the Houston Ship Channel, as well as those who are affected by Houston's

petrochemical-industrial complex. T.e.j.a.s. is dedicated to providing community members with

the tools necessary to create sustainable, healthy communities by educating individuals on health

concerns and the implications of environmental pollution; empowering individuals with an

understanding of applicable environmental laws and regulations, promoting enforcement of those

protections, and offering community building skills and resources for effective community action

and greater public participation. As an organization, t.e.j.a.s works to protect public health and

the environment from industrial pollution through education, policy development, community

awareness, and legal action. T.e.j.a.s's guiding principle is that everyone, regardless of race or

income, is entitled to live in a healthy and safe environment.

11.    Ana Parras is a co-founder, Executive Director, and member of t.e.j.a.s. She has

lived and worked in the heavily industrial East End of Houston, Texas, for more than twenty

years. Her home and office are located in an area that contains the highest density of

petrochemical facilities anywhere in the world. There are hundreds of aboveground chemical

storage tanks throughout Houston, including near where she lives and works. In 2017, Ms. Parras

lived through the worst benzene spill in Texas history, when an Exxon facility's benzene storage

failed during Hurricane Harvey. She has experienced adverse health effects as a result of her

exposure to hazardous chemicals in the past and fears that she and her community will continue

to suffer adverse effects in the absence of adequate federal regulation. EPA's refusal to issue

hazardous substance spill regulations increases the risk of harm to the health and environment of her community. Ms. Parras has therefore been and continues to be injured by EPA's refusal to issue the required regulations.

12.    People Concerned About Chemical Safety (PCACS) is a community-based organization based in West Virginia's Kanawha Valley and a member organization of EJHA. PCACS is dedicated to the protection of the health and safety of all who reside, work, and study in the vicinity of local chemical plants. PCACS promotes environmental justice and chemical safety through community organizing, education, and outreach. PCACS's members are current and former residents, workers, and students in the heavily industrial Kanawha Valley, which contains dense concentrations of aboveground storage tanks and chemical facilities that make, use, or store hazardous substances. PCACS's members have experienced dangerous chemical spills in the past and are fearful that spills from those facilities will harm their and their families' health by polluting the air and contaminating surrounding ground, surface, and drinking waters that they use and enjoy. EPA's refusal to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) increases the risk of harm from these facilities. PCAC's members therefore have been and continue to be injured by EPA's refusal to issue the required regulations.

13.    Maya Nye, PhD, is a member of PCACS. She has lived in the Kanawha Valley for the majority of her life. Her childhood in St. Albans, West Virginia, was marked by a series of chemical incidents at the many facilities around her family's home. Dr. Nye largely avoids recreating in the Kanawha River for fear of contamination, and she is often concerned about the safety of her tap water, which is drawn from the Elk River, the site of the 2014 Freedom Industries spill discussed in Paragraph 33. She is concerned about the likelihood of additional

chemical incidents from the many chemical facilities with unregulated hazardous substances on site and the danger to her health and wellbeing from chemical leaks. EPA's refusal to issue hazardous substance spill regulations increases Dr. Nye's risk of exposure to hazardous substances and harms her and her family's health and welfare. Dr. Nye has therefore been and continues to be injured by EPA's refusal to issue the required regulations.

14.     Kathy Ferguson is a member of PCACS. She grew up in the Kanawha Valley and has lived in the area continuously for the past eleven years. Her home is located a mile away from a cluster of chemical plants that make up the Altivia facilities campus. That campus includes multiple chemical manufacturing, processing, and distribution facilities. As she traverses the area around her home, she observes large aboveground storage tanks at the campus and on smaller tank farms along the Kanawha and Elk Rivers. She is concerned about the risk of exposure to hazardous substances from facilities, particularly after the 2014 Freedom Industries spill discussed in Paragraph 33, and the danger to her health and wellbeing from chemical leaks. EPA's refusal to issue hazardous substance spill regulations increases Ms. Ferguson's risk of exposure to hazardous substances and harms her and her family's health and welfare. Ms. Ferguson has therefore been and continues to be injured by EPA's refusal to issue the required regulations.

15.     Plaintiff Clean Water Action is a national, not-for-profit environmental membership organization with more than 250,000 members nationwide. Clean Water Action's mission includes prevention of pollution in the nation's water, protection of natural resources, creation of environmentally safe jobs and businesses, and empowerment of people to make democracy work. Its activities include policy research and advocacy, public education, and grassroots mobilization. Clean Water Action was involved with the passage of the Clean Water

Act amendments in 1972. Since its founding, Clean Water Action's core programs have included efforts to strengthen the Clean Water Act's implementation and enforcement, work toward the Act's goal of zero discharge of pollution into the waters of the United States, and protect drinking water sources from contamination.

16.    Clean Water Action brings this litigation on behalf of its members. Clean Water Action's members live near aboveground storage tanks that contain hazardous substances and are fearful that spills from those tanks will contaminate surrounding ground, surface, and drinking waters that they use and enjoy. EPA's refusal to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) increases the risk of harmful spills from these unregulated tanks. Clean Water Action's members therefore have been and continued to be injured by EPA's refusal to issue the required regulations.

17.    Becky Smith is a member of Clean Water Action. She lives in Houston, Texas, in a neighborhood that is a dense mix of residential, commercial, and industrial buildings, including petrochemical and chemical storage facilities. While she enjoys walking and biking in the bayous that surround her neighborhood, she is constantly on alert for chemical hazards due to the proximity of large numbers of chemical facilities with unregulated hazardous substances stored on site. She has observed noxious smells and discolored water in natural areas where her family recreates, and she limits her time outdoors and takes precautions to avoid contact with water to mitigate the risk of chemical exposure. She also avoids consuming local seafood for fear of contamination. EPA's refusal to issue hazardous substance spill regulations increases Ms. Smith's risk of exposure to hazardous substances and harms her and her family's health and welfare. Ms. Smith has therefore been and continues to be injured by EPA's refusal to issue the required regulations.

18.     Plaintiff Natural Resources Defense Council, Inc. (NRDC) is a national, not-for-profit environmental and public health membership organization with hundreds of thousands of members nationwide. NRDC engages in research, advocacy, media, and litigation related to protecting public health and the environment. NRDC litigates to implement and enforce the Clean Water Act, and fights to protect and secure clean, safe drinking water for communities across the country.

19.     NRDC brings this action on behalf of its members. NRDC's members live near aboveground storage tanks that contain hazardous substances and are fearful that spills from those tanks will contaminate surrounding ground, surface, and drinking waters that they use and enjoy. EPA's refusal to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) increases the risk of harmful spills from these unregulated tanks. NRDC's members therefore have been and continue to be injured by EPA's refusal to issue the required regulations.

20.     Laura Feld is a member of NRDC. She lives in Baton Rouge, Louisiana. She is aware of and concerned about the industrial chemical facilities in her area that store and sometimes release hazardous substances into Baton Rouge's air and water. Because of the density of chemical facilities where she lives, concerns about chemical disasters and health harms from hazardous substance discharges are part of everyday life for her. As a precaution, Ms. Feld only drinks filtered water in her home and avoids consuming local shellfish for fear of contamination and related health effects. Her fears about contamination are heightened by the lack of information about what hazardous substances are being used and stored around her. EPA's refusal to issue hazardous substance spill regulations increases Ms. Feld's risk of exposure to hazardous substances and harms her and her family's health and welfare.

9

**The Defendants**

21.     Defendant EPA is an agency of the United States government. EPA is responsible for administering the provision of the Clean Water Act at issue in this case and issued the final agency action challenged here.

22.     Defendant Lee Zeldin, EPA Administrator, is the highest ranking official in the EPA. A prior EPA Administrator, E. Scott Pruitt, signed the final agency action challenged here. Plaintiffs sue Administrator Zeldin in his official capacity.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under federal law. *See* 5 U.S.C. 702, 706(2); 33 U.S.C. § 1321(j)(1).

24.     This Court has authority to issue declaratory relief pursuant to 28 U.S.C. §§ 2201–2202.

25.     This Court has authority to set aside the EPA's final action refusing to promulgate hazardous substance spill regulations pursuant to 5 U.S.C. § 706.

26.     Venue is proper in this district because this action is brought against an agency of the United States and an officer of the United States acting in his official capacity and under color of legal authority, Plaintiff NRDC resides in the Southern District of New York, and no real property is involved in this action. *See* 28 U.S.C. § 1391(e)(1).

## STATUTORY AND REGULATORY FRAMEWORK

27.     Congress passed the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Through the Act, Congress announced that "it is the policy of the United States that there should be no discharges of oil or hazardous substances into the navigable waters of the United States." *Id.* § 1321(b)(1).

10

28.    To help meet that goal, Congress directed that "as soon as practicable after October 18, 1972, and from time to time thereafter, the President shall issue regulations . . . (C) establishing procedures, methods, and equipment and other requirements for equipment to prevent discharges of oil and hazardous substances . . . from onshore facilities . . . and to contain such discharges." 33 U.S.C. § 1321(j)(1).

29.    In 1973, the President delegated to the EPA Administrator the authority to issue regulations under 33 U.S.C. § 1321(j)(1) to prevent and contain discharges of hazardous substances from non-transportation-related onshore facilities. Exec. Order No. 11,735, § 1(4), 38 Fed. Reg. 21,243 (Aug. 7, 1973). In 1991, the President reaffirmed that delegation to the EPA Administrator. Exec. Order No. 12, 777, § 2(b)(1), 56 Fed. Reg. 54,757, 54,760 (Oct. 22, 1991).

30.    EPA has never issued regulations under 33 U.S.C. § 1321(j)(1)(C) to prevent and contain discharges of hazardous substances from non-transportation-related onshore facilities.

**FACTS**

31.    EPA's refusal to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) leaves many onshore hazardous substance storage facilities, including aboveground storage tanks, subject to neither state nor federal regulation. This regulatory vacuum has grave environmental and public health ramifications.

32.    According to U.S. Coast Guard data, there are hundreds of self-reported hazardous substance spills from onshore facilities each year. Many of those spills reach bodies of water, where, by definition, they "present an imminent and substantial danger to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, shorelines, and beaches." 33 U.S.C. § 1321(b)(2)(A). EPA has repeatedly noted that the self-reported Coast Guard data are incomplete and likely "greatly underestimate the actual number of spills because of significant underreporting." *See* 62 Fed. Reg. 54,508, 54,527 (Oct. 20, 1997).

33. A major incident in Charleston, West Virginia, provides a concrete example of the need for hazardous substance spill regulations. In January 2014, an aboveground storage tank owned by Freedom Industries ruptured, spilling over 10,000 gallons of a chemical mixture of crude methylcyclohexane methanol used to wash coal into the Elk River a mile and a half upstream of the state's largest drinking water intake. The spill contaminated the local water supply and left some 300,000 people without potable water for nearly a week. The chemicals continued to be detected in the water supply nearly three months later. That spill brought to national attention the fact that large, aboveground storage tanks containing dangerous chemicals near drinking water supplies are often unregulated and allowed to fall into disrepair.

34. Other significant spills include a 2006 spill in Garyville, Louisiana (2500 gallons of sodium hypochlorite), a 2007 spill in Medera, California (13,000 gallons of sodium hydroxide (caustic soda)), and a 2013 spill in Petersburg, Virginia (257,782 pounds of iron chloride, 32,595 pounds of ammonium chloride, and 73,754 pounds of hydrochloric acid).

35. Hazardous substances spills from chemical facilities jeopardize the health and environment, particularly in communities living in dense concentrations of industrial facilities that make, use, and store hazardous substances. For example, there is a significant presence of toxic chemicals in the tributaries of the Delaware River Basin, home to a highly industrialized corridor between Trenton, New Jersey, Philadelphia, Pennsylvania, and Wilmington, Delaware. A recent report from the Delaware River Basin Commission found concentrations of toxic chemicals (including Clean Water Act hazardous substances) in these waters in excess of state water quality standards, likely due to both legacy and ongoing contamination from chemical facilities in that area.

36.    Hazardous substance spills contribute to the contamination of these waters. For example, in 2023, the Trinseo chemical plant in Bristol, Pennsylvania spilled 8,100 gallons of butyl acetate, ethyl acetate, and methyl methacrylate into Otter Creek, a tributary of the Delaware River, threatening Philadelphia's drinking water supply.

37.    Chemical releases in the highly industrialized area in and around Houston are also shockingly common. In one recent example, the Baytown Fire Department outside of Houston discovered leaking methyl palmitate and diethylene glycol monoethyl ether at Bluebonnet Petrochemical Solutions, located on the banks of the Lynchburg Canal, a tributary of the San Jacinto River. The Coalition to Prevent Chemical Disasters' Chemical Incident Tracker, which tracks incidents involving hazardous chemicals as sourced from media reports, identifies more than 100 chemical incidents in Texas since January 2021, with more than two dozen of those occurring in the greater Houston area. *See* Chemical Incident Tracker, database and mapping tool, https://preventchemicaldisasters.org/chemical-incident-tracker/incidents.

*For decades, EPA failed to issue hazardous substance spill regulations*

38.    Since 1973, the EPA has had a duty to issue hazardous substance spill regulations under Section 1321(j)(1)(C) for non-transportation-related onshore facilities like aboveground storage tanks. *See* 42 U.S.C. § 1321(j)(1)(C); Exec. Order No. 11,735, § 1(4), 38 Fed. Reg. 21, 243 (Aug. 7, 1973); Exec. Order No. 12,777, § 2(b)(1), 56 Fed. Reg. 54,757, 54,760 (Oct. 22, 1991).

39.    The Clean Water Act requires these regulations to include "procedures, methods, and equipment and other requirements" for potential dischargers of hazardous substances, in order to fulfill Congress's declared policy "that there should be no discharges of . . . hazardous substances into or upon the navigable waters of the United States[.]" *Id.* § 1321(b)(1).

40.    Clean Water Act hazardous substances are designated under 33 U.S.C.
§ 1321(b)(2), which directs the EPA Administrator to "develop, promulgate, and revise as may be
appropriate, regulations designating as hazardous substances . . . such elements and compounds"
which may "present an imminent and substantial danger to the public health or welfare" when
discharged into U.S. waters and shorelines.

41.    The Clean Water Act leaves many details of the hazardous substance spill
regulations to EPA. But the statute unambiguously directs that there must *be* regulations.
Congress commanded that EPA "shall" issue regulations with a specific target—"hazardous
substances"—directed at a broad category of sources—"onshore facilities"—for a specific, and
important, goal—"prevent[ing]" and "contain[ing]" hazardous substance discharges. 33 U.S.C.
§ 1321(j)(1).

42.    EPA itself has long recognized that Section 1321(j)(1)(C) obligates the Agency to
issue regulations. *See, e.g.*, 38 Fed. Reg. 34,164 (Dec. 11, 1973).

43.    Despite this recognition, EPA has not issued any regulations under Section
1321(j)(1)(C) to prevent and contain discharges of hazardous substances from non-
transportation-related onshore facilities. As a result, onshore facilities that contain hazardous
substances are often left unregulated, exposing the public and the environment to serious harm
from spills.

*EPA entered a consent decree to issue hazardous substance spill regulations*

44.    In 2015, EJHA, PCACS, and NRDC sued to compel EPA to issue the hazardous
substance spill regulations required under Section 1321(j)(1)(C). *See* Compl., *Env't Just. Health
All. for Chem. Pol'y Reform v. EPA*, No. 15-cv-5705, Dkt. No. 1 (S.D.N.Y July 21, 2015).

45.    The parties settled the case through a Consent Decree, entered by the court in
February 2016, that required EPA to take final action, following notice-and-comment

rulemaking, pertaining to the issuance of hazardous substance regulations. Consent Decree, *Env't Just. Health All. for Chem. Pol'y Reform v. EPA*, No. 15-cv-5705, Dkt. No. 46 (S.D.N.Y. Feb. 16, 2016).

46.     On June 25, 2018, EPA published a proposed action that would refuse to establish hazardous substance spill regulations or any other additional regulatory requirements "[b]ased on an analysis of the frequency and impacts of reported [hazardous substance] discharges and the existing framework of EPA regulatory requirements." Clean Water Act Hazardous Substances Spill Prevention, 83 Fed. Reg. 29,499, 29,500 (June 25, 2018).

47.     Plaintiffs EJHA, NRDC, and Clean Water Action, in coalition with other environmental justice, public health, and environmental organizations, submitted comments urging EPA to reject its proposal to issue no regulations. Plaintiffs' comments alerted EPA that it lacked authority to refuse Congress' command to regulate and identified weaknesses in EPA's data-gathering, unaccounted-for limitations on the available data, and the inadequacy of existing regulations under other programs to fully address the prevention and response to hazardous substance spills required under Section 1321(j)(1)(C).

48.     Despite Plaintiffs' comments, EPA finalized its do-nothing proposal on September 3, 2019, refusing to issue hazardous substance spill regulations "based on an analysis of the frequency and impacts of reported [hazardous substance] discharges, as well as the existing framework of EPA regulatory requirements." 84 Fed. Reg. at 46,100; *see also id.* at 46,102 ("The EPA is finalizing this action as proposed, establishing no new regulatory requirements under the authority of CWA section 311(j)(1)(C) at this time.").

49.     EPA claimed that the "existing framework" of "discharge, containment and accident prevention regulatory requirements" under other statutory authorities "adequately serves

to prevent and contain [hazardous substance] discharges," "[b]ased on the reported frequency and impacts of identified [hazardous substance] discharges." *Id*. at 46,102.

*EPA refused to issue hazardous substance spill regulations based on an arbitrary analysis of admittedly incomplete information on hazardous substance facilities and impacts*

50.    EPA based its erroneous and unlawful conclusion on limited and incomplete information. EPA admitted that the data it relied on is incomplete. In its Regulatory Impact Analysis, EPA described the "sources of significant uncertainty" in its analysis, "including in the estimates of potentially regulated facilities, historical discharges, baseline compliance behavior, baseline damages, and potential benefits" of other regulatory options. But EPA declined to engage in meaningful information gathering under its existing authorities to inform its rulemaking.

51.    When EPA first initiated its rulemaking process, it determined that an Information Collection Request (ICR) would be "necessary" to support its rulemaking.

52.    EPA did not await the results of that ICR before issuing its proposal. Instead, EPA based its proposal and eventual final action on sources of information that systematically underestimate facilities that would potentially be covered by hazardous substance spill regulations and understate past occurrences of hazardous substance spills.

53.    Rather than complete its planned information gathering, EPA relied on the results of a 2018 voluntary survey directed at state and tribal authorities. EPA received responses from only fifteen states. 84 Fed. Reg. at 46,101-02. To estimate the number of facilities that would be subject to hazardous substance spill regulations, EPA relied on the Emergency Planning and Community Right-to-Know Act (EPCRA) "Tier II" annual inventory reports submitted by the responding states as a proxy for facilities that would potentially be subject to hazardous substance spill regulations. Based on those reports, EPA estimated that there are 108,000

hazardous substance facilities nationwide that would potentially be covered by a hazardous substance spill regulation. 84 Fed. Reg. at 46,125-26.

54.     Basing the facility estimate on EPCRA Tier II data necessarily underestimates the number of facilities that could be covered by hazardous substance spill regulations. A facility is only required to submit Tier II reports if it possesses hazardous chemicals at defined threshold amounts: 500 pounds for "extremely hazardous substances," 40 C.F.R. § 370.10(a)(1), and 10,000 pounds for other hazardous substances, *id*. § 370.10(a)(2). Thus, only facilities that have relatively large stores of hazardous substances are required to submit Tier II reports.

55.     By contrast, the Clean Water Act prohibits all discharges of listed hazardous substances, *see* 33 U.S.C. § 1321(b), and requires reports of discharges of much smaller amounts than the threshold amounts for Tier II reports, *see* 40 C.F.R. § 117.3. Many facilities that do not submit Tier II reports could be the source of significant, reportable hazardous substance discharges under the Clean Water Act.

56.     EPA never investigated those facilities. The Agency instead simply acknowledged that Tier II reports are underinclusive, "recogniz[ing] it has no information to assess or characterize non-Tier II facilities, and that the [hazardous substance] reportable quantities for some of the designated [hazardous substances] are measurably lower than the Tier II reporting thresholds." 84 Fed. Reg. at 46,107. EPA also acknowledged that it lacked "specific data at a national level on aboveground storage tanks that contain hazardous substances." *Id*. at 46,108. Without reasonably reliable information on the number and nature of facilities potentially subject to hazardous substance spill regulations, EPA could not rationally conclude that those regulations were unnecessary.

57.     EPA's analysis of the impacts of hazardous substance discharges is also undermined by a lack of information. EPA based its analysis of "reported impacts" of hazardous substance discharges on data reported to the U.S. Coast Guard's National Response Center. 84 Fed. Reg. at 46,103. The Response Center's dataset is incomplete because it relies entirely on facilities self-reporting spills. In past publications, EPA has stated that there are "significant limitations" to using Response Center data, such that those data should "represent the minimum number of spills" because "it is likely that they greatly underestimate the actual number of spills because of significant underreporting." *See* Oil Pollution Prevention; Non-Transportation Related Onshore Facilities, 62 Fed. Reg. 54,508, 54,527 (Oct. 20, 1997).

58.     The Response Center database is also of limited utility in assessing impacts from hazardous substance discharges because the facilities that do report spills generally do so immediately after an incident, before a facility has an accurate picture of the extent of a discharge or its impacts. There is no requirement for a facility or the Response Center to update a report to correct inaccuracies. Without reasonably reliable information on the impacts of all hazardous substance spills, EPA could not rationally conclude that hazardous substance spill regulations mandated by Congress were unnecessary.

*EPA refused to issue hazardous substance spill regulations based on an arbitrary assessment that existing programs adequately regulate hazardous substance discharges*

59.     EPA then identified several existing regulatory programs with prevention, containment, and mitigation provisions that it claimed were "relevant and of value in preventing and containing [hazardous substance] discharges." 84 Fed. Reg. at 46,102. EPA classified those program elements as safety information, hazard review, mechanical integrity, personnel training, incident investigations, compliance audits, secondary containment, emergency response plan, and coordination with state and local responders. *Id*. at 46,109-13; *see also id*. at 46,122 tbl. 2.

60.    The existing regulatory programs EPA identified each had *some* of the elements described above. *See id*. at 46,122 tbl. 2. But those regulatory programs do not, individually or collectively, cover all Clean Water Act hazardous substances or all facilities that may be sources of hazardous substance discharges.

61.    For instance, EPA identified the Clean Water Act Multi-Sector General Permit for Industrial Stormwater as one of the existing regulatory programs that address hazardous substance discharges. But that general permit is designed to mitigate pollution from stormwater runoff across industrial sectors. EPA has explained that discharge permitting and spill-prevention rules "do not replace" each other. *See* 49 Fed. Reg. 37,998, 38,014 (Sept. 26, 1984). What's more, the permit only applies in a few states, most territories, and most of Indian country; it does not apply to every industrial site, let alone every site that may store or use hazardous substances, nationwide.

62.    EPA also identified the Clean Air Act Risk Management Program (RMP) Rule as one of the existing regulatory programs that address Clean Water Act hazardous substance discharges. But the RMP Rule covers only certain toxic or flammable substances that could pose catastrophic harm when released to the *air*; it is not designed to regulate chemical discharge risks to water. Indeed, only 26 of the 330 chemicals listed as hazardous substances under the Clean Water Act are regulated under that RMP Rule. Additionally, the RMP Rule only regulates covered chemicals when stored and used in specified large quantities.

63.    EPA similarly identified its Clean Water Act Oil Spill Prevention Control and Countermeasure Rule as one of the existing regulatory programs that address Clean Water Act hazardous substance discharges. But that rule applies only to oil or oil mixed with other

substances. The Clean Water, however, defines "hazardous substances" to explicitly *exclude* oil. 33 U.S.C. §§ 1321(a)(14), (b)(2)(A) (further defining hazardous substance).

64.     EPA also identified the Federal Insecticide, Fungicide, and Rodenticide Act's (FIFRA) Pesticide Management Rule (40 C.F.R. part 165) as one of the existing regulatory programs that address Clean Water Act hazardous substance discharges. The Pesticide Management Rule only applies to specific types of businesses in the agricultural pesticide industry. *See, e.g.*, 40 C.F.R. §§ 165.20(b), .40(b), .80(b). It also applies only to chemicals that meet FIFRA's definition of a pesticide, which is limited to substances "intended for" "preventing, destroying, repelling, or mitigating any pest," "use as a plant regulator, defoliant, or desiccant," or "any nitrogen stabilizer." 7 U.S.C. § 136(u). The Pesticide Management Rule does not regulate hazardous substances that are not used by specific agricultural businesses and that are not intended for use as a pesticide.

65.     EPA identified the FIFRA Pesticide Worker Protection Standard (40 C.F.R. part 170) as one of the existing regulatory programs that address Clean Water Act hazardous substance discharges. The Pesticide Worker Protection Standard, however, applies only to chemicals that meet FIFRA's definition of a pesticide, which is limited to substances "intended for" "preventing, destroying, repelling, or mitigating any pest," "use as a plant regulator, defoliant, or desiccant," or "any nitrogen stabilizer." 7 U.S.C. § 136(u). The Pesticide Worker Protection Standard does not regulate hazardous substances that are not intended for use as a pesticide.

66.     EPA also identified the Resource Conservation and Recovery Act (RCRA) standards for generators of hazardous waste as one of the existing regulatory programs that address Clean Water Act hazardous substance discharges. These regulations apply only to

generators of "hazardous waste," as defined under RCRA. These regulations also apply only to *waste* materials—materials that are "abandoned," "recycled," or "considered inherently waste-like," 40 C.F.R. §§ 261.2(a)(2)(i), 261.3(a)—and do not then apply to Clean Water Act hazardous substances that are being created, stored for use, or used (or reused) at a facility.

67.    EPA also identified the RCRA standards for owners and operators of hazardous waste treatment, storage, and disposal facilities as one of the existing regulatory programs that address Clean Water Act hazardous substance discharges. But these regulations likewise apply only to substances that qualify as RCRA hazardous *waste* and do not apply to the storage of or industrial processes involving the use of Clean Water Act hazardous substances before those substances are being discarded.

68.    EPA identified the RCRA Underground Storage Tank (UST) Rule (40 C.F.R. part 280) as one of the existing regulatory programs that address Clean Water Act hazardous substance discharges. The UST Rule applies only to underground storage tanks and tank systems. *See* 40 C.F.R. § 280.10(a). It does not apply to purely aboveground storage tanks or other non-transportation-related onshore facilities that do not meet the definition of an "underground storage tank."

69.    EPA also identified the Emergency Planning and Notification Rule (40 C.F.R. part 355) issued under EPCRA as one of the existing regulatory programs that address Clean Water Act hazardous substance discharges. The Emergency Planning and Notification Rule applies only to certain chemicals listed as "extremely hazardous substances" under EPCRA. 40 C.F.R. § 355.10(a). Fewer than 20% of hazardous substances listed under the Clean Water Act are considered "extremely hazardous substances" under EPCRA. The Emergency Planning and

Notification Rule therefore does not apply to the vast majority of Clean Water Act hazardous substances.

70.     EPA also identified the EPCRA Reporting Rule (40 C.F.R. part 370) as one of the existing regulatory programs that address Clean Water Act hazardous substance discharges. The Reporting Rule applies to facilities that are required to prepare and have available a Material Safety Data Sheet, and that handle or store hazardous chemicals above threshold amounts (either 500 or 10,000 pounds, depending on the substance). 40 C.F.R. § 370.10(a)(1). The Reporting Rule does not apply to facilities storing, using, and otherwise handling Clean Water Act hazardous substances in amounts below those thresholds. The Reporting Rule also does not mandate any spill prevention or containment measures.

71.     Finally, EPA identified its Pulp and Paper Effluent Guidelines (40 C.F.R. part 430) as one of the existing regulatory programs that address Clean Water Act hazardous substance discharges. But those Guidelines apply only in the pulp, paper, or paperboard industry, not any other industrial sources of Clean Water Act hazardous substances. The Guidelines also apply only to "*spent* pulping liquors, soap, and turpentine," 40 C.F.R. § 430.03(d)(2)-(3) (emphasis added), not to any of those substances (or other Clean Water Act hazardous substances) that are being stored but which have not yet been used, or "spent," in the pulping process.

72.     The patchwork of regulatory programs EPA identified do not fully or adequately regulate all Clean Water Act hazardous substances or all sources of Clean Water Act hazardous substances. EPA therefore could not rationally rely on that patchwork to conclude that hazardous substance spill regulations mandated by Congress were unnecessary.

## CLAIMS FOR RELIEF

### *Count I: EPA's refusal to issue hazardous substance spill regulations is not in accordance with law (Administrative Procedure Act § 706(2)(A))*

73.    Plaintiffs incorporate by reference Paragraphs 1-72.

74.    The Clean Water Act requires the issuance of regulations to prevent and contain hazardous substance spills from onshore facilities into waters. 33 U.S.C. § 1321(j)(1)(C).

75.    EPA has been delegated authority from the President to issue hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C).

76.    In the Final Action, EPA affirmatively refused to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C).

77.    EPA's action refusing to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) is contrary to law.

### *Count II: EPA's refusal to issue hazardous substance spill regulations is arbitrary and capricious (Administrative Procedure Act § 706(2)(A))*

78.    Plaintiffs incorporate by reference Paragraphs 1-77.

79.    EPA did not have sufficient information to support its conclusion that the "frequency and impacts of reported Clean Water Act Hazardous Substances discharges" were inadequate to warrant issuing Section 1321(j)(1)(C) regulations.

80.    EPA arbitrarily short-circuited its information-gathering process, keeping the Agency from obtaining the information it would need to adequately assess crucial elements of its decision-making process, including the number of facilities that use, make, or store Clean Water Act hazardous substances, their distribution, and the potential impact of hazardous substance discharges.

81.    In basing its decision not to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) on admittedly incomplete data and information, EPA failed to consider an important aspect of the problem.

82.    EPA's conclusion from that admittedly incomplete data that the frequency and impacts of Clean Water Act hazardous substances discharges were not of sufficient magnitude to warrant regulation was arbitrary and capricious.

83.    EPA's explanation that the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) were unnecessary because "key prevention elements, as implemented through existing EPA regulatory programs, adequately serves to prevent, contain, or mitigate [hazardous substance] discharges," 84 Fed Reg. at 46,109, runs counter to the evidence before the Agency.

84.    The existing regulations EPA relied on to refuse to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) do not apply to every hazardous substance listed under the Clean Water Act. For example, EPA's oil spill prevention rule covers only oil, not Clean Water Act hazardous substances; and the Clean Air Act RMP Rule covers only 26 of the approximately 330 hazardous substances listed under the Clean Water Act, and at different threshold quantities.

85.    The existing regulations EPA relied on to refuse to issue the hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) also do not apply to all onshore facilities that may be sources of discharges of hazardous substances. For example, the RCRA UST Rule does not apply to aboveground tanks storing hazardous substances, and the identified FIFRA rules apply only to specific types of businesses in the agricultural pesticide industry.

86.     The existing regulations EPA relied on to refuse to issue Section 1321(j)(1)(C) hazardous substance spill regulations also do not establish adequate procedures, methods, equipment, and other requirements for equipment to prevent discharges of hazardous substances from onshore facilities. For example, the Clean Water Act Multi-Sector General Permit provides only high-level directions to minimize the potential for leaks and spills, such as "implement[ing] procedures for material storage and handling" and "develop[ing] training on the procedures" for stopping leaks and spills. And the EPCRA Reporting Rule contains no spill prevention or containment requirements at all.

87.     EPA's conclusion that this patchwork of regulations "adequately" regulated Clean Water Act hazardous substance spills was arbitrary and capricious.

88.     EPA's refusal to issue hazardous substance spill regulations required under 33 U.S.C. § 1321(j)(1)(C) is arbitrary and capricious.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment as follows:

A.  Declaring that EPA's refusal to issue hazardous substance spill regulations under 33 U.S.C. § 1321(j)(1)(C) is contrary to law and arbitrary and capricious;

B.  Holding unlawful and vacating the EPA's Final Action refusing to issue hazardous substance spill regulations under 33 U.S.C. § 1321(j)(1)(C);

C.  Remanding the matter to EPA and directing EPA to finalize a new decision on hazardous substance spill regulations that is consistent with its statutory mandate under 33 U.S.C. § 1321(j)(1)(C) by a date certain;

D.  Awarding Plaintiffs their costs and reasonable attorneys' fees; and

E.  Granting such other relief that the Court considers just and proper.

Dated: August 28, 2025                    Respectfully submitted,


 /s/ *Sarah A. Buckley*
Sarah A. Buckley (Va. State Bar 87350)*
Jared E. Knicley (DC Bar 1027257)*
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, D.C. 20005
T: (202) 836-9555 (Buckley)
F: (415) 795-4799
sbuckley@nrdc.org
jknicley@nrdc.org
*Pro hac vice motion pending*

Counsel for Plaintiffs