UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ENVIRONMENTAL JUSTICE HEALTH
ALLIANCE FOR CHEMICAL POLICY
REFORM; CLEAN WATER ACTION; and
NATURAL RESOURCES DEFENSE
COUNCIL, INC.,

      Plaintiffs,

         v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY; and LEE ZELDIN, Administrator of
the U.S. Environmental Protection Agency, in
his official capacity,

      Defendants.

25-cv-07166 (VEC)

---

# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN
# OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

JAY CLAYTON
United States Attorney for the
Southern District of New York
*Attorney for Defendants*
86 Chambers Street, 3rd Floor
New York, New York 10007

Dominika Tarczynska
Assistant United States Attorney
   *Of Counsel*

**TABLE OF CONTENTS**

**Page(s)**

PRELIMINARY STATEMENT………………………………………………………………..1

BACKGROUND ........................................................................................................................ 2

    I. Statutory Background .......................................................................................................... 2

    II. Regulatory History ........................................................................................................... 4

    III. Recent Rulemaking ........................................................................................................ 5

        A. 2015 Litigation ......................................................................................................... 5

        B. Information Collection and Analysis ........................................................................ 5

            1.      Public Meetings…………………………………………………………………...5

            2.      Analysis of Existing Regulations………………………………………………….6

            3.      Data Related to CWA HS Discharges, Impacts, and Regulated Entities…………...7

            4.      Voluntary Survey………………………………………………………………….8

        C. Proposed Rule ......................................................................................................... 10

        D. 2019 Final Action................................................................................................... 13

        E. Procedural History .................................................................................................. 15

LEGAL STANDARD............................................................................................................... 15

ARGUMENT ............................................................................................................................ 16

    I. EPA Acted in Accordance with Law.................................................................................. 16

    II. EPA's Decision Was Not Arbitrary and Capricious .......................................................... 20

        A. Plaintiffs Have Not Identified Any "Gaps" in Regulatory Coverage ............................ 21

        B. EPA's Decision Was Based on Adequate Information and Data.................................... 26

CONCLUSION.......................................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

Cases

*Advocs. for Highway & Auto Safety,*
862 F.3d ................................................................................................................. 29

*Alabama Power*,
636 F. 2d 323 (D.C. Cir. 1979) .............................................................................. 18

*Am. Coke & Coal Chems. Inst. v. EPA*,
452 F.3d 930 (D.C. Cir. 2006) ......................................................................... 15, 21

*Appalachian Power Co. v. EPA*,
249 F.3d 1032 (D.C. Cir. 2001) ............................................................................ 26

*Cellular Phone Taskforce v. FCC*,
205 F.3d 82 (2d Cir. 2000) .................................................................................... 26

*Center for Biological Diversity v. EPA*,
722 F.3d 401 (D.C. Cir. 2013) .............................................................................. 17

*City of Milwaukee v. Illinois & Michigan*,
451 U.S. 304, (1981) ......................................................................................... 2, 18

*Colleges & Universities v. Duncan*,
870 F. Supp. 2d 133 (D.D.C. 2012) ...................................................................... 28

*Cooling Water Intake Structure Coal. v. EPA*,
905 F.3d 49 (2d Cir. 2018) .................................................................................... 19

*Cuckic v. Jaddou*,
No. 21 Civ. 8395 (JPO), 2023 WL 2586031 (S.D.N.Y. Mar. 21, 2023) .............. 16

*Gas & Elec. Co. v. NRDC*,
462 U.S. 87 (1983) ................................................................................................ 15

*Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*,
41 F.4th 586 (D.C. Cir. 2022) ............................................................................... 26

*Idaho Conservation League v. Wheeler*,
930 F.3d 494 (D.C. Cir. 2019) .............................................................................. 17

ii

*Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*,
476 F.3d 946 (D.C. Cir. 2007) ................................................................................. 20

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ................................................................................................. 15

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................................. 21, 24

*N.C. Fisheries Ass'n, Inc. v. Gutierrez*,
518 F. Supp. 2d 62 (D.D.C. 2007) ........................................................................... 27

*Nat'l Ass'n for Surface Finishing v. EPA*,
795 F.3d 1 (D.C. Cir. 2015) ..................................................................................... 28

*New Jersey v. Bessent*,
149 F.4th 127 (2d Cir. 2025) .............................................................................. 16, 20

*New York v. Raimondo*,
594 F. Supp. 3d 588 (S.D.N.Y. 2022) ...................................................................... 16

*NRDC v. EPA*,
529 F.3d 1077 (D.C. Cir. 2008) ............................................................................... 28

*NRDC v. EPA*,
808 F.3d 556 (2d Cir. 2015) ..................................................................................... 16

*NRDC v. EPA*,
937 F.2d 641 (D.C. Cir. 1991) ................................................................................. 19

*NRDC v. Muszynski*,
268 F.3d 91 (2d Cir. 2001) ....................................................................................... 26

*NRDC v. USDA*,
598 F. Supp. 3d 98 (S.D.N.Y. 2022) ........................................................................ 20

*Pub. Citizen v. FTC*,
869 F.2d 1541 (D.C. Cir. 1989) ............................................................................... 18

*Riverkeeper, Inc. v. EPA*,
358 F.3d 174 (2d Cir. 2004) ............................................................................... 15, 19

Statutes

5 U.S.C. § 706 ........................................................................................................... 15

33 U.S.C. § 1311 ..................................................................................................... 2, 18

33 U.S.C. § 1321 .................................................................................................. passim

40 U.S.C. §§ 6921-6939g ............................................................................................ 3

42 U.S.C. § 6901 .......................................................................................................... 3

42 U.S.C. § 9601 ....................................................................................................... 3, 4

42 U.S.C. § 11001 ........................................................................................................ 4

44 U.S.C. § 3506 .......................................................................................................... 5

Regulations

40 C.F.R. 261.4 ............................................................................................................ 4

40 C.F.R. Part 68 ...................................................................................................... 4, 6

40 C.F.R. Part 112 ............................................................................................... 4, 6, 11

40 C.F.R. Part 165 ....................................................................................................... 6

40 C.F.R. Part 170 ....................................................................................................... 6

40 C.F.R. Part 262 ....................................................................................................... 6

40 C.F.R. Part 280 ....................................................................................................... 6

40 C.F.R. Part 355 .................................................................................................... 4, 6

40 C.F.R. Part 370 .................................................................................................... 6, 8

40 C.F.R. Part 403 ....................................................................................................... 7

40 C.F.R. Part 430 ....................................................................................................... 6

40 C.F.R. Part 440 ....................................................................................................... 7

40 C.F.R. Part 442 .............................................................................................................. 7

40 C.F.R. Part 450 .............................................................................................................. 7

40 C.F.R. Part 451 .............................................................................................................. 7

40 C.F.R. Part 455 .............................................................................................................. 7

40 C.F.R. Part 761 .............................................................................................................. 7

40 C.F.R. § 117.21 .......................................................................................................... 7, 8

40 C.F.R Part 761 .............................................................................................................. 3

40 C.F.R. § 300.415 ........................................................................................................... 4

**PRELIMINARY STATEMENT**

Over the 50 years since the passage of the Clean Water Act ("CWA"), the United States Environmental Protection Agency ("EPA" or the "Agency") has developed and maintained a broad regulatory framework that works effectively to prevent and mitigate discharges of CWA-listed hazardous substances ("CWA HS") from non-transportation-related sources into water (the only discharges that could be regulated under the statutory provision at issue here). EPA acted squarely within its statutory authority when it determined, after notice and comment rulemaking, that this framework met "the requirements of CWA section 311(j)(1)(C) and was serving to prevent, contain and mitigate CWA HS discharges." (EPA0079826). Over the ten-year period of data considered as part of the extensive rulemaking record, discharges of CWA HS from non-transportation-related sources that reached water comprised less than 1% of all chemical discharges, averaging only approximately 27 such discharges per year that had impacts on human health and the environment. Plaintiffs' characterization of EPA's extensive action in this regulatory area as inaction is inaccurate; and Plaintiffs' citation to discharges outside the scope of the statutory provision at issue here is misleading.

Contrary to Plaintiffs' assertion, EPA did not substitute its judgment for Congress's on the question of whether CWA HS regulations were necessary; rather, EPA determined that it had *already* passed regulations that satisfied § 311(j)(1)(C), and therefore, *additional* regulation was not necessary at the time. This decision was not arbitrary and capricious, as Plaintiffs contend. EPA relied on the best available data to reach the conclusion that the cumulative framework of numerous robust regulatory programs works to prevent and contain such discharges, particularly when analyzed against the backdrop of the CWA's blanket prohibition on CWA HS discharges. Plaintiffs' attempt to point to purported gaps in regulatory programs and take statements in the

record out of context does not undermine EPA's reasonable conclusion that together these regulations are working to prevent and contain CWA HS discharges.

Accordingly, the Court should deny Plaintiffs' motion for summary judgment, and grant Defendants' cross-motion.

## BACKGROUND

### I.  Statutory Background

The CWA was enacted in 1972 with the stated goal "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and the intent that "there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States . . . or which may affect natural resources." 33 U.S.C. § 1321(b)(1). In furtherance of that goal, the CWA bans, among other things, "the discharge of any pollutant." 33 U.S.C. § 1311(a); *see also City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 318, (1981) (recognizing that under the CWA, "[e]very point source discharge is prohibited unless covered by a permit, which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goals."). The CWA also specifically prohibits discharges of CWA HS[1] into or upon the navigable waters of the United States in quantities that may be harmful, except in limited situations deemed by regulation not to be harmful. *See* 33 U.S.C. § 1321(b)(3).

CWA § 311(j)(1)(C), the provision at issue here, states in relevant part that the President "as soon as practicable after October 18, 1972 . . . shall issue regulations . . . establishing procedures, methods, and equipment and other requirements for equipment to prevent discharges

---

[1] The CWA defines a "hazardous substance" as any substance designated by the EPA Administrator. 33 U.S.C. § 1321(a)(14).

of oil and hazardous substances from vessels and from onshore facilities. . . , and to contain such discharges." 33 U.S.C. § 1321(j)(1)(C). In 1973, the President delegated responsibility to regulate non-transportation-related onshore facilities to EPA. Exec. Order No. 11,735, § 1(4), 38 Fed. Reg. 21243, 21243 (Aug. 7, 1973); *see also* Exec. Order No. 12,777, § 2(b)(1), 56 Fed. Reg. 54757, 54760 (Oct. 18, 1991) (reaffirming delegation).

Since the CWA's passage in 1972, Congress has enacted numerous additional statutory regimes that regulate hazardous substances, pursuant to which EPA has promulgated and maintained an extensive framework of regulations, including:

Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, passed in in 1976 and amended several times, authorized EPA to identify by regulation hazardous wastes subject to RCRA requirements, and establish requirements for such wastes from generation, through transportation, treatment, and storage, to ultimate disposal, and regulated underground storage tanks. *See* 40 U.S.C. §§ 6921-6939g.

Toxic Substances Control Act ("TSCA"), passed in 1976, provided EPA with authority to promulgate reporting, record-keeping and testing requirements, and restrictions relating to chemical substances and/or mixtures. EPA has promulgated regulations under TSCA to govern the management of polychlorinated biphenyl ("PCB") waste generated from PCB spills and associated cleanup activities. 40 C.F.R Part 761.

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, passed in 1980, established a comprehensive program for release reporting and response to the release or threatened release of hazardous substances. Under CERCLA, EPA updated and broadened the National Oil and Hazardous Substances Contingency

3

Plan ("NCP") to establish methods and procedures to prevent, minimize, and mitigate threats presented by listed CERCLA hazardous substances (which includes all listed CWA hazardous substances). *See, e.g.*, 40 C.F.R. § 300.415(b)(1): "where the lead agency makes the determination… that there is a threat to public health or welfare… the lead agency may take any appropriate removal action to abate, *prevent*, stabilize, *mitigate*, or *eliminate* the release or threat of release" (emphasis added).

Emergency Planning and Community Right-to-Know Act ("EPCRA"), 42 U.S.C. § 11001 *et seq.*, enacted in 1986 to help local communities plan for chemical emergencies. EPA has promulgated regulations under EPCRA to require hazardous chemical emergency planning by federal, state and local governments, Indian tribes, and industry; industry reporting about storage, use, and releases of hazardous substances to federal, state, and local governments; and public access to such information. 40 C.F.R. Part 355, 370.

Section 112 of the Clean Air Act ("CAA"), under which, EPA promulgated "Chemical Accident Prevention Provisions" often referred to as the "Risk Management Program (RMP) rule" to improve chemical accident prevention at facilities and require facilities that use regulated substances to develop a Risk Management Plan. 40 C.F.R. Part 68.

## II. Regulatory History

Following the passage of the CWA, EPA initially focused its regulatory efforts on oil. In 1973, it promulgated oil regulations under § 311(j)(1)(C), which also apply when oils are mixed with other substances, including CWA HS. 40 C.F.R. Part 112. Oil, unlike CWA HS, is specifically excluded or exempted from many major environmental regulatory schemes, discussed above. *See, e.g.,* 42 U.S.C. § 9601(14); 40 C.F.R. 261.4.

4

In March 1978, EPA designated a list of CWA HS pursuant to CWA § 311(b)(4), 33 U.S.C. § 1321(b)(4). 43 Fed. Reg. 10,474 (March 13, 1978). In September 1978, EPA proposed requirements for CWA HS that were never finalized under § 311(j)(1)(C), which would have applied to facilities subject to National Pollution Discharge Elimination System ("NPDES") permitting requirements. *See* 43 Fed. Reg. 39,276 (Sept. 1, 1978). In August 1979, EPA established reportable quantities of CWA HS. *See* 44 Fed. Reg. 50,766 (August 29, 1979). As discussed below, in the next 40 years EPA promulgated various regulations related to CWA HS under other statutory programs, including other CWA provisions.

## III.  Recent Rulemaking

### A.  2015 Litigation

In 2015, Plaintiffs filed a lawsuit to compel EPA to issue regulations addressing CWA HS under CWA § 311(j)(1)(C). *See EJHA v. EPA*, 15-cv-5705 (SAS). The parties ultimately signed a consent decree, entered February 16, 2016, pursuant to which the parties agreed that within 28 months,[2] EPA would sign a notice of proposed rulemaking pertaining to the issuance of HS regulations under CWA § 311(j)(1)(C), and 14 months thereafter, take final action following notice and comment rulemaking. *EJHA* at Dkt. 46 (*see also* EPA0069496-97).[3]

### B.  Information Collection and Analysis

#### 1.  *Public Meetings*

In 2016, EPA held three public meetings to gain early input from stakeholders, including nongovernmental organizations, local governments, private citizens, and representatives from

---

[2] If EPA did not intend to issue an information collection notice pursuant to 44 U.S.C. § 3506(c)(2)(A), the deadline was 18 months.

[3] Citations formatted as EPAXXXXXXX refer to the Administrative Record lodged in this case.

industry and trade organizations, to be considered during the rulemaking development. *See* 82 Fed. Reg. 29,499, 29,501 (June 25, 2018) (EPA0001677); *see also* EPA0069454-55, 458-481, 483.

### 2. *Analysis of Existing Regulations*

At the outset of the rulemaking process, EPA undertook an extensive review of existing provisions relevant to preventing, containing, or mitigating CWA HS, which it detailed in a *Background Information Document: Review of Relevant Federal and States Regulations*. (EPA0071164-393 (Mar. 12, 2018)). EPA first developed an analytical framework of nine program elements based on its experience in developing and implementing discharge and prevention programs: (1) Safety Information, (2) Hazard Review, (3) Mechanical Integrity, (4) Personnel Training, (5) Incident Investigations, (6) Compliance Audits, (7) Secondary Containment, (8) Emergency Response Plan, and (9) Coordination of Emergency Response Program with State/Local Responders. (EPA0001680; EPA0071171).

EPA then identified eleven EPA regulatory programs that regulate CWA HS or facilities that use or store CWA HS, and analyzed whether and how each one individually addressed the nine program elements:

1.  NPDES Multi-Sector General Permit ("MSGP") for Industrial Stormwater, 2015;
2.  Pulp and Paper Effluent Guidelines (40 C.F.R. Part 430); Spill Prevention, Control, and Countermeasure ("SPCC") Rule (40 C.F.R. Part 112);
3.  CAA Regulation - RMP (40 C.F.R. Part 68);
4.  Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") Regulations;
5.  Pesticide Management Regulation (40 C.F.R. Part 165);
6.  Pesticide Worker Protection Standard (40 C.F.R. Part 170);
7.  RCRA Generators Regulation (40 C.F.R. Part 262);
8.  RCRA Treatment, Storage, and Disposal Facilities ("TSDF") Regulations (40 C.F.R. Parts 264 and 265);
9.  Solid Waste Disposal Act Regulation - Underground Storage Tanks ("UST") (40 C.F.R. Part 280);

6

10. EPCRA Emergency Planning and Notification (40 C.F.R. Part 355);

11. EPCRA Hazardous Chemical Inventory Reporting (40 C.F.R. Part 370).

(EPA0071177).

After receiving comments on the proposed rule, EPA prepared a supplemental Background Information Document (EPA0079953-80049 (June 27, 2019)) analyzing seven additional EPA regulatory programs:

1. CWA NPDES Pretreatment Standards (40 C.F.R. Part 403);

2. TSCA PCB Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions ("TSCA PCB Regulations") (40 C.F.R. Part 761);

3. CWA Effluent Guidelines and Standards: Ore Mining and Dressing Point Source Category (40 C.F.R. Part 440);

4. CWA Effluent Guidelines and Standards: Transportation Equipment Cleaning Point Source Category (40 C.F.R. Part 442);

5. CWA Effluent Guidelines and Standards: Construction and Development Point Source Category (40 C.F.R. Part 450);

6. CWA Effluent Guidelines and Standards: Concentrated Aquatic Animal Production Point Source Category (40 C.F.R. Part 451);

7. CWA Effluent Guidelines and Standards: Pesticide Chemicals Point Source Category (40 C.F.R. Part 455).

(EPA0079966).

3. *Data Related to CWA HS Discharges, Impacts, and Regulated Entities*

In addition to acquiring information via public meetings and the regulatory framework analyses, EPA also gathered available data from the following sources related to the scope of historical CWA HS discharges, their impacts, and the universe of potentially regulated entities (EPA0079828):

National Response Center ("NRC") data about all oil, chemical, radiological, biological, and etiological discharges between 2007 and 2016 (EPA0080828-37) that was collected by the U.S. Coast Guard as the designated federal point of contact under 40 C.F.R. § 117.21, which

requires immediate notification to the NRC whenever the person in charge of a vessel or an offshore or onshore facility has knowledge of a discharge in any 24-hour period exceeding reportable quantities. (EPA0079859).

National Toxic Substance Incidents Program ("NTSIP") data, which is collected and combined by the Agency for the Toxic Substances and Disease Registry ("ATSDR") from many sources. (EPA0079830, 79859). EPA supplemented its analysis of NRC impact data with reported NTSIP impact data (about evacuations, injuries, hospitalizations, fatalities, waterway closures, and water supply contamination) for identified CWA HS discharges. (*Id.*).

EPCRA Tier II reports submitted by facilities storing HS onsite to state, local and fire authorities, as required by 40 C.F.R. Part 370, for 2014, 2015, and 2017 (the latest available) in 16[4] states, which EPA used to determine the universe of potentially affected facilities. EPA then extrapolated the data nationwide based on North American Industry Classification System ("NAICS") codes and U.S. Census data. (EPA0079833).

4. *Voluntary Survey*

To further supplement the existing available data, EPA developed a voluntary survey for states, territories, and tribes. While EPA had initially intended to gather information regarding current prevention practices and other facility-specific information to inform the development of prevention program elements, as survey development progressed, EPA revised the survey's focus to instead help inform the estimate of the universe of potentially subject facilities, the impacts of

---

[4] In response to the voluntary survey (discussed below), EPA received Tier II reports from an additional state (for a total of 17), which it incorporated into its analysis. (EPA0079851).

discharges, and to identify new, potentially relevant discharges not reflected in the NRC data. (EPA0079829-30).

On September 21, 2017, EPA issued a Federal Register notice announcing the planned information collection request, providing a 60-day comment period. 82 Fed. Reg. 44,178 (Sept. 21, 2017) (EPA0000001). At the close of the comment period on November 20, 2017, EPA had received comments from 11 sources, including industry organizations, non-governmental organizations (which included the Plaintiffs in this action), and a consortium of state, tribal, and local emergency response agencies. (EPA0000066; *see also* EPA000007-43). Prior to issuing the survey, EPA reviewed the comments and provided responses. (EPA0000066-82).

On June 22, 2018, EPA issued the voluntary survey (*see* EPA0000004-6) directed at State and Tribal Emergency Response Coordinators (respondents with custodial responsibility for data representing the potentially affected "facility universe" that produce, store, or use CWA HS), as well as state, tribal, and territorial government agencies with custodial responsibility for data on CWA HS impacts to drinking water utilities and fish kills potentially caused by discharge(s) of CWA HS. (EPA0001677). The survey requested information about EPCRA Tier II facilities, discharges of hazardous substances to surface waters from 2007 to 2016, fish kills, and existing state programs in place to help prevent and mitigate the impacts of discharges of hazardous substances to surface waters. (EPA0079859-60).

Between June 22, 2018, and August 6, 2018, EPA received relevant responses from 15 states: Alabama, California, Delaware, Hawaii, Indiana, Kentucky, Maryland, Massachusetts, Minnesota, Missouri, New Hampshire, New Mexico, Oregon, Rhode Island, and Texas.

(EPA0000122-83; EPA0000184-92; EPA0001593-50), which were made publicly available for review and comment (EPA0001651-52).

### C.   Proposed Rule

On June 25, 2018, EPA issued a notice of proposed rulemaking in which it proposed no new regulatory requirements under CWA § 311(j)(1)(C). 83 Fed. Reg. 29,499 (June 25, 2018) EPA explained that "in the 40 years since CWA section 311(j)(1)(C) was enacted by Congress, multiple statutory and regulatory requirements have been established under different Federal authorities that generally serve to, directly and indirectly, prevent CWA HS discharges. Some states have also established their own discharge prevention provisions relevant to CWA HS. Based on EPA's analysis of the frequency and impacts of reported CWA HS discharges and the existing framework of EPA regulatory programs and implementing regulations, EPA is not proposing additional regulatory requirements at this time." (EPA0001692).

In the proposal, EPA explained the process it had followed (EPA0001677): *First*, EPA analyzed all discharges reported to NRC to estimate the frequency and impacts of CWA HS discharges. From 2007 to 2016, the NRC received reports of 285,867 releases of all kinds (including, for example, discharges of oil, chemical, radiological, biological materials to a variety of media). From these, EPA identified only 9,416 (approximately 3.3%) as CWA HS discharges. Of those, 3,140 reached water, and just 2,491 (less than 1% of total reports) originated from non-transportation-related sources. (EPA0001678). EPA then determined that only 117 of these (CWA HS discharges from non-transportation-related sources that reached water) had impacts. (*Id.*) EPA explained that it intended to supplement this data with the results of the voluntary survey, which would "further inform th[e] regulatory action." (EPA0001677).

Relying on this data, Plaintiffs misleadingly argue that there are nearly 1,000 HS spills being reported each year. Pls' Br. 9 (citing 83 Fed. Reg. 19502 (*see also* EPA0001678)). However, the vast majority of these discharges are from transportation-related sources, which are outside the scope of EPA's delegated authority. *See* 40 C.F.R. Part 112, Appendix B. Many others did not reach water or did not have impacts. When the NRC data is properly understood, the annualized number of CWA HS discharges with impacts from non-transportation sources that reached water is only a fraction of what Plaintiffs assert. (*See* EPA0001678, EPA0079851).

Based on this data, EPA identified the 13 most frequently discharged CWA HS substances, which together account for 90% of all identified CWA HS discharges to water from non-transportation-related facilities and 80% of the 117 discharges with reported impacts. (EPA0001678-9).

*Next*, EPA identified the analytical framework of nine program elements, discussed above (EPA0001679-81), and explained that, for all nine program elements, there were existing, cumulative EPA regulatory requirements relevant to CWA HS (EPA0001681-90). Additionally, EPA explained that existing cumulative requirements administered by other Federal agencies and departments (*i.e.,* OSHA, MSHA, PHMSA, and OSMRE) also addressed all nine program elements as they relate to CWA HS. (EPA0001686).

EPA looked further at the regulatory framework in the context of most frequently discharged CWA HS, and determined that the majority of identified CWA HS discharges to water from non-transportation-related sources have been discharges of chemicals currently subject to discharge or accident prevention regulatory requirements. (EPA0001692).

11

*Finally*, EPA explained two alternative regulatory options that it had considered: *First,* a CWA HS discharge prevention program that would include provisions to address all nine program elements, require facilities to develop and implement a written plan with site-specific prevention measures and practices, and allow credit for and/or incorporation of existing prevention compliance strategies. (EPA0001692). EPA explained that it chose not to propose this approach because data regarding the in-scope CWA HS discharges with reported impacts suggested that the existing regulatory framework adequately serves to prevent such discharges. (*Id.*). *Second,* EPA considered proposing a limited set of requirements tied to program elements that were identified in its review of causes of CWA HS discharges.[5] However, with respect to the majority cause, unknown/illegal dumping (in violation of existing laws), EPA explained that there was either too little information provided to develop a prevention strategy, or additional regulatory requirements would be unlikely to alleviate the problem of those who already violate existing regulations and the CWA's blanket ban on discharges. (EPA0001692). With respect to the remaining causes, EPA identified four key program elements—hazard review, mechanical integrity, personnel training, and secondary containment—that could address discharges, but explained that these program elements were already contained in existing regulatory programs and there would be only minimal incremental value in requiring these provisions in a new regulation, which may not justify the associated costs. (EPA0001694).

---

[5] The causes of the 117 CWA HS discharges with impacts over the 10-year period were identified as: Unknown/Illegal Dumping/Other (74 discharges), equipment failure (17 discharges), natural phenomenon (4 discharges), operator error (10 discharges), and fire/explosion (12 discharges). (EPA0001693).

EPA requested comments on all aspects of its proposed action, including, *inter alia*, data sources and analyses, approaches to estimating impacts, review of existing regulatory requirements, and alternatives considered. (EPA0001678, 1692-95).

### D.  2019 Final Action

On September 3, 2019, EPA issued a Final Action (the "Final Action") deciding not to establish additional or new discharge prevention and containment regulatory requirements under CWA § 311(j)(1)(C) at that time. 84 Fed. Reg. 46,100 (Sept. 3, 2019) (EPA0079826-62). Based on its in-depth analyses of the frequency, impacts, and causes of identified CWA HS discharges, and its comprehensive evaluation of the existing framework of EPA discharge, containment, and accident prevention regulatory requirements, EPA determined that "this existing framework adequately serves to prevent and contain CWA HS discharges." (EPA0079828; 79853). Moreover, EPA explained that "[w]hile this final action does not establish any new requirements, the Agency reiterates that the CWA prohibits discharges of CWA HS in quantities that may be harmful, with exceptions only where otherwise permitted or under such circumstances or conditions as the President may, by regulation, determine not to be harmful, irrespective of whether facilities are subject to hazardous substance spill prevention regulations." (EPA0079830).

The Final Action was based on the same data and regulatory analyses as the proposal, and further supplemented by data received in response to the voluntary survey and comments received on the proposed rule. In sum, based on ten years of NRC data, data on impacts from ATSDR's NTSIP, and survey responses,[6] EPA identified a subset of 265 discharges with impacts (such as

---

[6] From the NRC and NTSIP data, EPA had identified 2,491 potentially relevant discharges and 117 discharges with impacts nationwide, and an additional 159 discharges, 148 of them with impacts, from the survey responses. (EPA00079851).

fish kills, evacuations, injuries, hospitalizations, fatalities, sheltering in place, waterway closures, water quality alerts/events/advisories, and water supply contamination) from a total of 2,650 historical, CWA HS discharges from non-transportation sources that reached water over the 10-year period analyzed. (EPA0079851). Based on extrapolated EPCRA Tier II information, which EPA identified as the "best available data for estimating the potential universe" of affected facilities, (EPA0079833), combined with survey responses,[7] EPA estimated that there were 108,000 potentially regulated facilities nationwide. (EPA0079852).

EPA considered and responded to comments which (like Plaintiffs) argued that discharges reflected in NRC data are necessarily more likely to be underreported than overreported, as well as comments supporting EPA's use of the NRC data. (EPA0079830-33). While EPA acknowledged that the completeness and accuracy of NRC data is dependent on the reporting individuals, it explained that the NRC data was "the best readily available source of relevant information on CWA HS discharges in the United States," and disagreed that discharges were necessarily more likely to be underreported than overreported. (EPA0079830). Contrary to Plaintiffs' theory, one commenter had noted that facilities err on the side of reporting due to potential penalties for failure to report, and members of this commenter's organization compared their records to NRC data, revealing few discrepancies between the two and even a tendency toward over-reporting. (EPA0080069; 79832). This commenter, like several others, agreed that

---

[7] In response to the survey, EPA received Tier II reports from Delaware (which it did not previously have and incorporated into its analysis) and from Minnesota (which it already had from the Tier II reports). (EPA0079851).

14

"the NRC database is the best source of information on a history or pattern of discharges." (EPA0073987).

In analyzing the existing statutory and regulatory programs addressing CWA HS, EPA did not quantify the applicability or inapplicability of each regulatory program to each facility, instead focusing on a mostly qualitative review. (EPA0071378). "[EPA] recognize[d] that no single program element or regulatory provision may individually prevent and contain CWA HS discharges from occurring. However, [its final] action is not based on any individual provision and/or program preventing CWA HS discharges, but rather on how the cumulative framework of key prevention elements, as implemented through existing EPA regulatory programs, adequately serves to prevent, contain, or mitigate CWA HS discharges under section 311(j)(1)(C)." (EPA0079835).

### E.  Procedural History

Nearly six years later, on August 28, 2025, Plaintiffs filed the instant action challenging the 2019 Final Action. ECF No. 1. The Government lodged its administrative record on December 17, 2025, which includes 80,827 pages of documents and 10 voluminous data files. ECF No. 31.

### LEGAL STANDARD

Under the Administrative Procedure Act ("APA"), a court must uphold an agency action unless the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). APA review "is narrow, limited to examining the administrative record to determine whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Riverkeeper, Inc. v. EPA*, 358 F.3d 174, 184 (2d Cir. 2004) (quotation marks omitted). "Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential." *Loper Bright Enters. v. Raimondo*, 603

U.S. 369, 392 (2024) (emphasis in original). "The court owes particular deference to EPA when its rulemakings rest upon matters of scientific and statistical judgment within the agency's sphere of special competence and statutory jurisdiction." *Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 941–42 (D.C. Cir. 2006); *accord Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983) (recognizing deference to "predictions, within [agency's] area of special expertise"); *NRDC v. EPA*, 808 F.3d 556, 569 (2d Cir. 2015) (affording "greater deference regarding factual questions involving scientific matters in [agency's] area of technical expertise."); *New York v. Raimondo*, 594 F. Supp. 3d 588, 598 (S.D.N.Y. 2022) (same)

"A court must . . . grant summary judgment to the Government unless it determines by a preponderance of the evidence that the agency has *not* considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there is a 'rational connection between the facts found and the choice made." *Cuckic v. Jaddou*, No. 21 Civ. 8395 (JPO), 2023 WL 2586031, at *11 (S.D.N.Y. Mar. 21, 2023) (quotation marks omitted) (emphasis in original).

## ARGUMENT

### I. EPA Acted in Accordance with Law

EPA acted within its statutory authority when it determined, after engaging in notice and comment rulemaking, that "the existing regulatory framework meets the requirements of CWA section 311(j)(1)(C) and is serving to prevent, contain and mitigate CWA HS discharges" and therefore no new regulations were necessary at that time. (EPA0079826). This determination was based on a reasoned and informed analysis, and the Court "[can]not substitute [its] judgment for that of the [EPA]" in this regard. *New Jersey v. Bessent*, 149 F.4th 127, 152 (2d Cir. 2025). Plaintiffs' argument that EPA's decision is contrary to law, Pls' Br. 10-14, appears to be based on

16

two incorrect assertions: *first,* that EPA has declined to regulate CWA HS and, *second,* that EPA was required to issue a single regulation that covers all scenarios and specifically identify it as being issued under § 311(j)(1)(C).

EPA's position is that it *has already issued extensive regulations* to prevent and contain CWA HS discharges under other statutory provisions, and therefore no *additional* regulation was necessary at this time.[8] It is not a situation in which EPA deemed regulation unnecessary[9]—but rather, deemed it unnecessary at the time to pass *additional* regulations beyond the framework of regulatory programs it had already promulgated. EPA was not "second guessing" Congress's choices or substituting its judgment for that of Congress, as Plaintiffs contend. Rather, EPA made the determination that Congress's directive had already been fulfilled.[10]

---

[8] The facts here are distinguishable from *NRDC v. EPA*, in which the court rejected an intervenor's argument that "'most' of the [statutorily required] provisions [were] 'essentially' satisfied by other mechanisms." 595 F. Supp. 1255, 1261 (S.D.N.Y. 1984). In that case, unlike here, EPA had not engaged in rulemaking regarding the four chemicals at issue and had not performed a detailed analysis of existing regulations. Likewise inapposite are the cases holding that "shall" indicates a mandatory duty, *see* Pls' Br. 11, because even when Congress uses the word "shall" this still leaves EPA with discretion as to the *substance* of its rulemaking. *See Idaho Conservation League v. Wheeler*, 930 F.3d 494, 501, 504-05 (D.C. Cir. 2019) (rejecting plaintiffs challenge to EPA's decision "not to issue financial responsibility regulations for the hardrock mining industry" under 42 U.S.C. § 9608(b))(1), where "[i]n particular, the EPA found that existing federal and state programs as well as modern mining practices reduced the risk that the EPA would be required to use the Superfund to finance response actions at currently active mines.").

[9] Nor has EPA argued that a policy reason exists as to why certain categories of discharges or emissions should be exempted from otherwise mandatory regulation, as was at issue in in *Center for Biological Diversity v. EPA,* 722 F.3d 401, 414 (D.C. Cir. 2013), on which Plaintiffs rely, Pls' Br. 12.

[10] This case is unlike *Whitman v. American Trucking Associations*, in which the Court found that there was a conflict between two subparts of the CAA and held that EPA could not interpret them in such a way as to nullify the restrictions on EPA's authority imposed by one subpart. 531 U.S. 457, 487-88 (2001).

There is no merit to Plaintiffs' argument that EPA's 2019 Final Action conflicts with CWA's policy statement that "it is the policy of the United States that there should be *no discharges* of oil or hazardous substances into or upon the navigable waters of the United States" Pls' Br. 13 (quoting 33 U.S.C. § 1321(b)(1), emphasis in Pls' Br.). As an initial matter, there is a specific CWA provision—which follows in the very same subsection as that policy statement—that already prohibits all such discharges. 33 U.S.C. § 1321(b)(3); *see also* 33 U.S.C. § 1311(a); *City of Milwaukee*, 451 U.S. at 318. The provision at issue here is aimed at establishing "procedures, methods, and equipment and other requirements for equipment" to prevent and contain discharges, 33 U.S.C. § 1321(j)(1)(C), which are the very types of regulatory requirements that are present in the regulatory framework that EPA has promulgated and maintained for decades. Moreover, that regulatory framework is effectively achieving the CWA's goal, as is evidenced by the minimal numbers of discharges of CWA HS over the last 10 years that have reached water and had impacts. As EPA specifically noted, because failure to comply with existing requirements was the primary cause of discharges, "there is no reason to believe that establishing what may be redundant provisions would alleviate discharges from facilities that disregard existing regulations." (EPA0079856).

Plaintiffs cite EPA's discussion of comments which indicated that additional rules would provide "*de minimis* regulatory benefit" and then argue that *de minimis* exemption case law does not apply and that EPA cannot substitute its views for Congress's about the costs and benefits of regulation. Pls' Br. 13. Again, this mischaracterizes EPA's position. This is not a situation like the one described in *Public Citizen v. FTC*, and *Alabama Power v. Costle*, relied upon by Plaintiffs, Pls' Br. 13, 28, in which the agency recognizes that "the regulatory function does provide benefits"

18

but "concludes that the acknowledged benefits are exceeded by the costs." *Pub. Citizen*, 869 F.2d 1541, 1557 (D.C. Cir. 1989) (quoting *Alabama Power*, 636 F. 2d 323, 360-61 (D.C. Cir. 1979)). EPA expressly explained that it had not engaged in a cost-benefit analysis, rather its determination was based on the determination that "further regulation would provide only minimal incremental value." (EPA0079829).

Nothing in the statutory language imposed an obligation on EPA to issue a single regulation (and specifically identify it as having been issued under § 311(j)(1)(C)) addressing all CWA HS and all elements of preventing and containing CWA HS discharges. Indeed, portions of § 311(j)(1)(C) have been regulated separately—discharges of oil, discharges from offshore facilities, discharges from transportation sources—a fact that Plaintiffs do not argue with. Plaintiffs have pointed to no legal authority prohibiting EPA from regulating different aspects of CWA HS through different regulatory mechanisms. *Cf. Cooling Water Intake Structure Coal. v. EPA,* 905 F.3d 49, 66 (2d Cir. 2018) (rejecting argument that EPA inappropriately abdicated its statutory obligation to set standards for entrainment reduction under the CWA because it did not establish a single, national, categorical entrainment standard, and noting that CWA § 316(b) "does not compel the EPA to regulate either by one overreaching regulation or on a case-by-case basis."); *Riverkeeper*, 358 F.3d at 201 (noting that "courts have recognized . . . that a foolish consistency is the hobgoblin of small minds" and explaining that "[t]he [CWA] does not forbid the EPA from addressing certain environmental problems on a case-by-case basis").

Likewise without merit is Plaintiffs' argument that because, in 1972, Congress enacted "potentially overlapping requirements" in § 311(j)(1)(C) and statutory requirements to establish the NPDES permitting program and effluent limitation guidelines, it contemplated two separate,

19

but "potentially overlapping," regulations. *See* Pls' Br. 12. Plaintiffs have pointed to no case law supporting such a formulaic interpretation. To the contrary, courts have recognized that agencies may look to other statutory schemes and provisions when determining how to regulate. *Cf. NRDC v. EPA*, 937 F.2d 641, 649 (D.C. Cir. 1991) ("we find that EPA was not arbitrary or capricious in its decision not to list surface coal mines on the basis of its projection of the effects of the prohibitions and regulations that [the Department of the] Interior will enforce."); *New Jersey*, 149 F. 4th at 154-55 (rejecting argument that IRS could not "rel[y] on factors that Congress did not intend the agency to consider" by looking to Congress's objective under Section 164 when it was promulgating rules under section 170, and further noting that "the agency Congress vests with administrative responsibility must be able to exercise its authority to meet changing conditions and new problems."). In any event, it was not just regulations issued under other provisions of the CWA that EPA identified as regulating CWA HS, as nine of the eleven regulatory programs analyzed in the Background Information Document were issued pursuant to other statutes. (EPA0071177). Moreover, as EPA explicitly noted in the Final Action, "nothing in this action precludes future EPA regulatory actions under CWA section 311(j)(1)(C)" in the future if conditions change and problems with the current framework arise. (EPA0079828).

## II.  EPA's Decision Was Not Arbitrary and Capricious

Contrary to Plaintiffs' argument, EPA's decision was not arbitrary and capricious due to purported "gaps" in the existing regulatory scheme and the nature of the data that EPA considered in reaching its decision. *See* Pls' Br. 14-30. Although Plaintiffs attempt to imply otherwise, the test in this case is not whether the regulations that EPA analyzed are perfect in regulating CWA HS, but rather whether EPA's decision was "rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *NRDC v.*

20

*USDA*, 598 F. Supp. 3d 98, 107 (S.D.N.Y. 2022); *see also Kennecott Greens Creek Min. Co. v. Mine Safety & Health Admin.*, 476 F.3d 946, 954 (D.C. Cir. 2007) ("[O]ur standard of review under the arbitrary and capricious test is only reasonableness, not perfection."). Because it was, the Court should deny Plaintiffs' challenge.

### A. Plaintiffs Have Not Identified Any "Gaps" in Regulatory Coverage

Plaintiffs have not met the heavy burden of challenging EPA's determination that the broad, currently existing regulatory framework serves to prevent and contain discharges of CWA HS. They have not shown that EPA "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Am. Coke & Coal Chemicals Inst.*, 452 F.3d at 941 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).

Plaintiffs misleadingly argue that EPA has acknowledged that the identified programs do not cover all CWA HS and onshore facilities by quoting language from the Federal Register notice in which EPA explains that the identified programs "regulate[] at least some" CWA HS and "or at least some facilities that produce store, or use" such substances. *See* Pls' Br. 14 (quoting 84 Fed. Reg. at 46,117). That quotation is taken out of context. With that statement, EPA was explaining that "[t]he regulatory programs discussed in the proposed action were selected" for analysis "because they include discharge or accident prevention requirements and were identified as regulating *at least some CWA HS*; or regulating *at least some facilities* that produce, store, or use CWA HS." 84 Fed. Reg. at 46,117 (emphasis added). EPA then examined these provisions individually and together, and determined that "for all nine program elements, there are existing

21

cumulative regulatory requirements for accident and discharge prevention and containment relevant to CWA HS under *various* EPA programs." *Id.* (emphasis added). EPA repeatedly explained that it "recognize[d] that no single program element or regulatory provision may individually prevent and contain CWA HS discharges from occurring" and that "this action is not based on any individual provision and/or program" but rather on "the cumulative framework of key prevention elements" in the extensive existing EPA regulatory programs. (EPA0079835).

It is undisputed that not *all* of the programs identified by EPA regulate *all* CWA HS in *all* scenarios, but this does not make EPA's decision arbitrary and capricious. *See* Pls' Br. 16-21; 23-24. Nevertheless, certain mischaracterizations in Plaintiffs' motion warrant further response:

- CAA RMP Rule and EPCRA Planning Rule: Plaintiffs argue that only four out of the 13 most commonly discharged CWA HS fall under the CAA RMP Rule, Pls' Br. 16-17, and only five qualify under EPCRA as extremely hazardous substances, *id.* at 19. EPA never argued otherwise. Instead, EPA explained that the 13 most frequently discharged CWA HS (which together account for 89% of all CWA HS discharges to water from non-transportation-related facilities, and 83% of those with reported impacts) "are subject to multiple regulatory programs that serve to prevent CWA HS discharges." (EPA0080106; EPA0079840). Indeed, all 13 are regulated by at least three other regulatory schemes analyzed by EPA. (*Compare* EPA0001678 *with* EPA0080036-49 (chart of CWA HS chemicals)).[11] For example, sulfuric acid (covered

---

[11] As EPA explained, the chart contained in Background Information Document Appendix A, which lists all CWA HS and identifies the regulations applicable to each, expressly does not include regulations the applicability of which is determined by criteria other than the identity of

by RMP if fuming), the second most commonly discharged CWA HS (EPA0071375), is also regulated by the UST regulation (if stored in USTs), EPCRA Regulations, and the NPDES MSGP for Industrial Stormwater. (EPA0080106).

- SPCC Rule: Plaintiffs selectively quote EPA's response to comments, Pls' Br. 17, and ignore EPA's reasoning, which explained that there are facility-wide benefits and mixed-use benefits of the SPCC rule. For example, where CWA HS and oil handling activities (*e.g.,* operations, piping, storage containers) are co-located, the prevention elements of the SPCC program can also serve to prevent, contain, and mitigate CWA HS discharges at a facility-wide level. (EPA0080098). This may also be important where containers and related equipment may be interchangeably used for both oil and CWA HS service, for example: operations, piping, and storage containers that meet the regulatory applicability and threshold requirements would be subject to the SPCC regulation. (EPA0080109-10). This reasoning directly contradicts Plaintiffs' assertion that such SPCC measures "do nothing" to prevent CWA HS discharges. Pls' Br. 15.

- TSCA PCB regulations: Plaintiffs selectively quote EPA to argue that these regulations apply to only one subset of PCBs. Pls' Br. 19. This is false. As EPA clearly noted in the Supplemental BID, while PCB storage requirements *do* apply to PCBs which "have been removed from service and designated for disposal," PCB storage requirements "*also apply to any PCB liquids* (50 ppm or greater) in PCB Containers *which are being stored for authorized servicing of electrical equipment*." (EPA0079968) (emphasis

---

the chemical. (EPA0080035). Those regulations are analyzed elsewhere in the Background Information Document, and cover CWA HS if applicability criteria are present.

added). Moreover, while it is true that PCBs are only a single CWA HS, PCBs were in fact *the most commonly discharged* CWA HS between 2007 and 2016. (EPA0071375). Like the other 13 most frequently discharged CWA HS, PCBs are covered by at least four regulatory programs analyzed in EPA's rulemaking, including the NPDES MSGP for Industrial Stormwater, the UST Rule (if stored in a UST), EPCRA regulations, and the SPCC rule. (*Id*.; EPA0080144). PCBs may also be regulated by RCRA in some situations. (EPA0071374).

- NPDES MSGP for Industrial Stormwater: Plaintiffs selectively quote and misrepresent EPA's Background Information Document analysis and response to comments to suggest that these regulations have minimal coverage. *See* Pls' Br. 21-22. However, even in states where EPA is not the permitting authority, "[r]egulated facilities under the jurisdiction of authorized states *are expected to be subject to similar provisions in a state-issued NPDES permit.*" (EPA0071179) (emphasis added). Moreover, "because *many states model their industrial stormwater permits after EPA's permit*, it was used to identify prevention requirements likely to be present in NPDES industrial stormwater permits issued by states." (EPA0071178) (emphasis added).

- CWA Effluent Guidelines: As Plaintiffs recognize, these are industry-specific effluent guidelines; however, the fact that EPA did not identify specific CWA HS that each industry's guidelines cover because "the applicability of these regulations is determined by criteria other than the identity of the chemical" does not mean that the guidelines do not apply to CWA HS, as Plaintiffs imply. *See* Pls' Br. 21 (quoting EPA0079970). Rather, the best management practices ("BMPs") for these categories

24

apply to all discharges resulting from the activity and therefore have the potential to prevent and contain a number of CWA HS. (EPA0079970-71).

Plaintiffs' conclusory arguments about how commenters identified "numerous gaps in these programs," *see* Pls' Br. 16, *see also id.* 22-23, do not actually identify any scenarios that threaten CWA HS discharges into water without regulatory coverage. The sole purported "unanalyzed gap" that Plaintiffs identify is aboveground storage tanks ("ASTs"), which they argue was the source of the 2014 Elk River spill of 10,000 gallons of methylcyclohexane, *see* Pls' Br. 22. Plaintiffs' suggestion that CWA HS stored in AST are not subject to *any* regulatory programs is false. Depending on the specific chemical stored, whether it is mixed with other substances, and the type of facility where it is stored, such CWA HS may be regulated by RCRA, EPCRA, RMP, and SPCC regulations, as well as state and local requirements, and industry standards. (EPA0071180; *see also* EPA0073655 ("it is clear that most ASTs are regulated in a manner (federal or state) that addresses risks associated with sudden and catastrophic discharges of their contents to waters, or risks associated with fire and safety issues."); EPA0080132-33, 80136; EPA0000016, 32, 1679, 66576, 66709, 67519, 67529, 67587, 67822, 67830, 67993, 70930, 71164, 73649, 74006, 74039, 73977, 74006, 74040, 74047, 74075). Further, methylcyclohexane (the chemical spilled at Elk River) is not a CWA HS, and therefore could not generally be addressed by §311(j)(1)(C) unless comingled with another CWA HS or designated by the EPA Administrator as a CWA HS. (EPA0080181). Finally, the facility at issue in that spill is now subject to a comprehensive state AST regulatory program (EPA0067993-68056).[12]

---

[12] Likewise, the "chemical disasters" described in Plaintiffs' declaration, Pls' Br. 9, generally appear to be from incidents that were outside the scope of § 311(j)(1)(C), either because they were

25

### B.  EPA's Decision Was Based on Adequate Information and Data

Likewise without merit are Plaintiffs' challenges to the data that EPA relied upon in reaching its decision. In evaluating EPA's decision under the arbitrary and capricious standard, the Court should look to whether EPA "examine[ed] the relevant data and establish[ed] a rational connection between the facts found and the choice made." *NRDC v. Muszynski*, 268 F.3d 91, 99 (2d Cir. 2001) (quoting *Cellular Phone Taskforce v. FCC*, 205 F.3d 82, 89 (2d Cir. 2000)). As detailed in the final agency action, EPA did both of those things—its rulemaking began with an analysis of the best available data regarding CWA HS discharges, which was then supplemented with the results of a voluntary survey that was specifically designed to supplement the available data. (EPA0079854; EPA0079859). The fact that EPA acknowledged the limitations of the NRC dataset does not make its decision arbitrary and capricious. Rather, it evidences reasoned and transparent decisionmaking that complies with the APA. *See Advocs. for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 41 F.4th 586, 597 (D.C. Cir. 2022) ("[T]he APA does not require that agencies make the perfect the enemy of the good. What matters is that the evidence used had probative relevance, and that the agency acknowledged its limitations when evaluating it." (citation omitted)); *Appalachian Power Co. v. EPA*, 249 F.3d 1032, 1052 (D.C. Cir. 2001) (per curiam) ("That a model is limited or imperfect is not, in itself, a reason to remand agency decisions based upon it.").

---

air rather than water releases, or they were not of CWA HS substances; and moreover, they occurred from facilities that were otherwise regulated. For example, in the Feld Declaration there is discussion of a fire at an *oil* refinery that would be covered under other federal and state regulations, ECF No. 40 ¶ 6; the Nye Declaration discussed the Elk River spill described above, and what appears to be an *air* release from a pesticide manufacturing explosion, ECF No. 41 ¶¶ 2,5-6; and the William Declaration discusses an *air* release of ethylene oxide that was subject to a state regulatory program, ECF No. 37 ¶¶ 4-5.

*First*, Plaintiffs' contention that NRC data "systematically underestimated" CWA HS discharges is unfounded.[13] Pls' Br. 24-26. While EPA acknowledged that the completeness and accuracy of NRC data is dependent on the reporting individuals, it disagreed with the view that discharges were more likely to be underreported than overreported. EPA concluded the NRC data was "the best readily available source of relevant information on CWA HS discharges in the United States," (EPA0079830; 80069), a conclusion that a number of commentors agreed with (EPA0080070; 73987, 74001, 78866). In addition, EPA developed a voluntary survey to collect additional information, which it incorporated into the quantities of CWA HS discharges analyzed. (EPA0079852). Plaintiffs have not pointed to a better source of data regarding CWA HS discharges that EPA ignored, and thus its challenge on this basis fails. *See N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 85 (D.D.C. 2007) ("Absent some indication that superior or contrary data was available and that the agency ignored such information, a challenge to the agency's collection of and reliance on scientific information will fail.").

*Second,* Plaintiffs' claim that EPA underestimated the number of facilities (by using EPCRA Tier II reports submitted to states and localities) likewise fails. Pls' Br. 26-28. While EPA acknowledged the uncertainties associated with the estimate of potentially regulated facilities, and noted that it had no information to assess or characterize facilities that are not required to report

---

[13] Plaintiffs quote, EPA's language regarding the limitations of using NRC data in two very unique contexts—oil spill from farms and spills of vegetable oil and animal fats. *See* Pls' Br. 25 (citing 2015 study related to Oil Storage on U.S. Farms (EPA0079015), and a 1997 Federal Register notice, 62 Fed. Reg. 54,508, 54,527 (Oct. 20, 1997)).  EPA noted that there may be underreporting in the farm context due to a lack of awareness of reporting requirements (EPA0079015-16). This is not a general characterization of the NRC data, and Plaintiffs have pointed to no similar concerns regarding CWA HS discharges.

27

because they store chemicals in quantities below the Tier II threshold, it nevertheless explained that Tier II information is the best available data for estimating the potential universe of potentially regulated facilities and also supplemented that information with information from the voluntary survey. (EPA0079833, 80072, 80142). The law does not require more. *See Ass'n of Priv. Colleges & Universities v. Duncan*, 870 F. Supp. 2d 133, 151 (D.D.C. 2012) ("[T]he use of the best available data is firmly recognized by the case law, even when that data is imperfect." (quotation marks omitted)). As the D.C. Circuit explained when it rejected arguments that "EPA could have used *better* data in conducting its risk analysis[,] [w]hether or not this is true, it misstates the inquiry under the arbitrary and capricious standard. . . , the sole question before [the court] is whether EPA has acted reasonably, not whether it has acted flawlessly." *NRDC v. EPA*, 529 F.3d 1077, 1086 (D.C. Cir. 2008) (emphasis in original); *see also Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 12–13 (D.C. Cir. 2015) ("We recognize that EPA conceivably 'could have used better data in conducting its risk analysis,' but that 'misstates [our] inquiry under the arbitrary and capricious standard.'").

Plaintiffs contend that EPA ignored the suggestion to use North American Industry Classification System ("NAICS") as a source of information about facilities. Pls' Br. 27. That is not the case. As EPA explained in response to comments, it investigated using NAICS early in the process and found that it only provides a rudimentary estimate of the number of facilities that may have CWA HS based on industrial process or product. (EPA0000075). EPA did use NAICS codes to list entities that could be affected by the action, but then used Tier II reports to identify facilities

28

with CWA HS onsite because those reports contain information about many substances, of which CWA HS are a subset. (EPA0080142; *see also* 80071).[14]

Plaintiffs take statements out of context to incorrectly suggest that EPA could not identify the facilities at issue—when in fact what EPA explained was that it was taking a conservative approach and considering facilities even if it could not absolutely determine that discharges from those facilities would reach water (and therefore be within the scope of the CWA's coverage). *See* Pls' Br. 28 (quoting EPA0080073).[15] In any event, there is no reason to believe that even if there were an error in EPA's estimate of the number of potentially regulated facilities, such error would have impacted EPA's conclusions about the frequency of CWA HS discharges, which were based on NRC data and the survey results, and Plaintiffs make no effort to explain otherwise. *See Advocs. for Highway & Auto Safety,* 862 F.3d at 70 ("In the absence of any argument that the proposed additional analysis would have affected the outcome, we defer to the Administration's decision to proceed 'on the basis of imperfect scientific information[.]'").

*Finally,* Plaintiffs contend that EPA "abandoned" the initial plan for the voluntary survey, Pls' Br. 27, attempting to mischaracterize what EPA actually did, and ignoring EPA's explicit

---

[14] Plaintiffs also argue that EPA ignored the suggestion of extrapolating from EPA's Toxic Release Inventory ("TRI"), citing the State of Washington, Department of Ecology's comment. Pls' Br. 27 (citing EPA0074036). However, while the comment mentions TRI data, it does not ask EPA to use such data, does not indicate how such data could be used to estimate the universe of potentially regulated facilities, or argue that it is a better source of data.

[15] In their brief, Plaintiffs' added a "sic" to a quote from EPA's responses to comments. Pls' Br. 28. This is particularly misleading, as the full quote states that EPA "could not identify, for purposes of this final action, an appropriate method to quantify those facilities that would *not* have the potential to discharge to waters subject to CWA jurisdiction." And, "[t]herefore, estimated the universe of potentially subject facilities using a conservative approach and assumed that all CWA HS facilities identified in this rulemaking have the potential to discharge CWA HS to waters subject to CWA jurisdiction." (EPA0080073 (emphasis showing where Plaintiffs added *sic*)).

29

explanation for its action. The fact that EPA employed a fluid and adaptive approach, adjusting the survey during its development to gather the information that would be most useful in informing its decisionmaking—seeking additional information about the universe of potentially subject facilities and of the impacts associated with the 10-year CWA HS discharge data to supplement the available data (EPA0001679)—is indicative of reasoned decisionmaking, not a choice to avoid gathering relevant information, as Plaintiffs contend, Pls' Br. 29.[16] Plaintiffs criticize the voluntary survey as "pointless," but have not explained why they believe pursuing the original set of questions for the survey would have better informed the decisionmaking, or how EPA could have compelled mandatory responses to the survey. Pls' Br. 29.

Ultimately, none of Plaintiffs' criticisms of the EPA's decisionmaking demonstrate that EPA's decision was arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Government's Cross-Motion for Summary Judgment should be granted and Plaintiffs' Motion for Summary Judgment should be denied.

Dated: New York, New York
        May 1, 2026

                                        Respectfully submitted,

                                        JAY CLAYTON
                                        United States Attorney for the
                                        Southern District of New York

---

[16] Plaintiffs complain about the timing of the survey and the fact that it was sent out concurrently with the proposed rule. Pls' Br. 29. However, the time needed to implement the change in approach about the information being gathered, in conjunction with the court ordered deadline, did not allow EPA to await the survey results before publishing the proposed action. Nevertheless, EPA considered the data received through the voluntary survey when revising its regulatory analysis to further inform the eventual final action, as detailed above. (EPA0079829).

By:    /s/ Dominika Tarczynska
   DOMINIKA TARCZYNSKA
   Assistant United States Attorney
   86 Chambers Street, 3rd Floor
   New York, NY 10007
   (212) 637-2748
   dominika.tarczynska@usdoj.gov

31

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.1(c) and Section II.E. of the Court's Individual Rules and Practices for Civil Cases, the undersigned counsel hereby certifies that this memorandum complies with the word-count limitation of the Court's individual rules. As measured by the word processing system used to prepare it, this memorandum contains 8,737 words.

_/s/ Dominika Tarczynska_
Assistant United States Attorney